FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2007 SEP -4  A 11: 03

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

**TOURO INFIRMARY**

**CIVIL ACTION NO.** 07-5352

**SECTION** _____

**vs.**

**JUDGE** _____ SECT. K MAG. 2

**UNITED STATES OF AMERICA, BOARD
OF COMMISSIONERS OF THE
ORLEANS LEVEE DISTRICT, BOARD
OF COMMISSIONERS OF THE EAST
JEFFERSON LEVEE DISTRICT, SEWERAGE
AND WATER BOARD OF NEW ORLEANS, ST.
PAUL FIRE & MARINE INSURANCE COMPANY,
NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, BOARD OF COMMISSIONER
FOR THE PORT OF NEW ORLEANS, CSX
CORPORATION, CSX TRANSPORTATION, INC.,
& THE PUBLIC BELT RAILROAD COMMISSION
FOR THE CITY OF NEW ORLEANS**

*******************************************************************

## COMPLAINT FOR DAMAGES

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, Touro Infirmary, who

respectfully submits its Complaint for Damages as follows:

____ Fee 350 00
____ Process CONDoms.
__X_ Dktd _____
____ CtRmDep_____
____ Doc. No_____

## INTRODUCTION

1.

This Complaint arises out of catastrophic failures of, and deficiencies in, the hurricane protection system surrounding the Parish of Orleans, State of Louisiana, which occurred on and after August 29, 2005. These failures and deficiencies caused and substantially contributed to the inundation of approximately 80% of the New Orleans metropolitan area, causing extensive harm and loss of life and destroying or rendering uninhabitable approximately 160,000 residences and buildings.

2.

Plaintiff owned properties located at 1401 Foucher St., 3322 St. Claude, 3600 Prytania, 1407 Delachaise, 3527 Prytania Garage, 3437-39 Prytania, 3638 St. Charles, 3525 Prytania St., Ste. 105, 3450 Chestnut/Gumbel Building, 3434 Prytania/Buckman MOB, 1419 Amelia Street, 3515 Chestnut, and 3412 Prytania, New Orleans, Louisiana 70115 on or about August 29, 2005 when the New Orleans levee system failed. The failure of the New Orleans levee system, the horrific result of man-made acts, caused extensive damage to Plaintiff's business and contents among other damages discussed *infra*.

## PARTIES

3.

Plaintiff is a nonprofit organization organized under the laws of the state of Louisiana with its principal place of business in this district. Plaintiff presented a claim to the United States Army Corps of Engineers (the "Corps") for damages arising out of the failure of the New Orleans levee and floodwall system pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671, *et seq*. The Corps

acknowledged receipt of Plaintiff's claim. Plaintiff also presented a claim to the Corps for damages arising out of the failure of the New Orleans levee and floodwall system pursuant to the Suits in Admiralty Act, 46 U.S.C. §30901-18, the Public Vessels Act, 46 U.S.C. §46-31101-13, the Admiralty Extension Act, 46 U.S.C. §30101, and the general maritime law of the United States. The Corps acknowledged receipt of Plaintiff's second claim. Six months have elapsed since the presentation of Plaintiff's claims, and the United States Army Corps of Engineers has failed to act by either accepting or rejecting Plaintiff's claims. Thus, such failure must presumably be considered a denial of Plaintiff's claims.

4.

Defendant United States of America is a sovereign government amenable to suit for civil liability in accordance with the federal laws and regulations as set forth herein. The United States Army Corps of Engineers is an extension of the United States government (collectively the "Corps").

5.

Defendant Board of Commissioners for the Orleans Levee District ("OLD") is a local government entity created by Louisiana Revised Statute §38:291, amenable to suit, and domiciled in the Parish of Orleans, State of Louisiana.

6.

Defendant Sewerage and Water Board of New Orleans ("SWB") is a political subdivision of the State of Louisiana created by Louisiana Revised Statute §33:4071 *et seq.*, amenable to suit, and domiciled in the Parish of Orleans, State of Louisiana.

7.

Defendant Board of Commissioners of the East Jefferson Levee District ("EJLD") is a

political subdivision of the State of Louisiana created by Louisiana Revised Statute §38:291, amenable to suit, and domiciled in the Parish of Jefferson, State of Louisiana.

8.

Defendant St. Paul Fire and Marine Insurance Company ("St. Paul") is a foreign insurance company authorized to do and doing business within the State of Louisiana. At all times relevant hereto, St. Paul had in full force and effect a policy of liability insurance, under the terms, provisions, and conditions of which it assumed liability for the acts and/or negligence of its insured, the Board of Commissioners of the Orleans Levee District, and is therefore liable to Plaintiff. Plaintiff asserts its claims against St. Paul under the Louisiana Direct Action Statute, LSA-R.S. 22:655.

9.

Defendant National Union Fire Insurance Company of Pittsburgh ("National Union") is a foreign insurance company authorized to do and doing business within the State of Louisiana. At all times relevant hereto, National Union had in full force and effect a policy of liability insurance, under the terms, provisions, and conditions of which it assumed liability for the acts and/or negligence of its insured, the Board of Commissioners of the East Jefferson Levee District, and is therefore liable to Plaintiff. Plaintiff asserts its claims against National Union under the Louisiana Direct Action Statute, LSA-R.S. 22:655.

10.

Defendant The Board of Commissioners of the Port of New Orleans ("PNO") is a local governmental entity created by Louisiana Revised Statute §34:1, amenable to suit, and domiciled in the Parish of Orleans, State of Louisiana.

4

11.

Defendant CSX Corporation ("CSX Corp.") is a foreign corporation doing business in the Parish of Orleans, State of Louisiana.

12.

Defendant CSX Transportation, Inc. ("CSX Inc.") is a foreign corporation doing business in the Parish of Orleans, State of Louisiana.

13.

Defendant Public Belt Railroad Commission for the City of New Orleans ("PBR") is an entity amenable to suit and domiciled in the Parish of Orleans, State of Louisiana.

14.

Plaintiff avers that this matter is timely to all Defendants and is within the applicable statute of limitations as there is a related class action proceeding pending in this Court in the matter captioned *In re Katrina Canal Breaches Litigation*, No. 05-4182(K)(2) (Ref: LEVEE). As the United States Supreme Court recognized in *Crown, Cork, & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983), "'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action.'" *Id.* at 353-54 (quoting *American Pipe & Constr. Co. v. Utah*, 454 U.S. 538, 554 (1974)).

## JURISDICTION

15.

This Court maintains subject matter jurisdiction over this action pursuant to 28 U.S.C. §1346(b) (Defendant United States) and 28 U.S.C. §2671, *et seq.* (Federal Tort Claims Act),

violations of law of the United States, including, but not limited to, 16 U.S.C. § 1451 *et seq.* (Coastal Zone Management Act), and, 33 U.S.C.§403 *et seq.* (River & Harbors Act), and, alternatively, for violation of the Constitution and Law of the State of Louisiana as well as the Constitution and Laws of the United States.

16.

Plaintiff has presented to the Corps the written administrative claims required by the provisions of 28 U.S.C. §2671, *et seq.* (Federal Tort Claims Act) and in all respects have complied with the provisions of this statute. As discussed *supra*, a period of at least six months has elapsed since the filing of Plaintiff's written administrative claims.

17.

Alternatively, Plaintiff invokes jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction). Additionally, and in the alternative, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1367 in as much as this Court has supplemental jurisdiction over all state law claims herein arising out of the same case or controversy.

18.

Alternatively, Plaintiff pleads admiralty and maritime jurisdiction and causes of action under the Admiralty Extension Act, 46 U.S.C. §30101, the Suits in Admiralty Act, 46 U.S.C. § 30901-18, and/or the Public Vessels Act, 46 U.S.C. § 31101-13. Upon information and belief, one or more vessels owned, operated, and/or controlled by the United States government in the construction of the levees, floodwalls, and canals at issue in this Complaint caused and/or contributed to Plaintiff's damages. Plaintiff has presented to the Corps the written administrative claims required by the provisions of 46 U.S.C. §30101 (Admiralty Extension Act). A period of at least six months has

elapsed since the filing of Plaintiff's written administrative claims.

## VENUE

19.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Defendants' negligent and wrongful actions occurred in the Eastern District of Louisiana, a substantial part of the events and omissions giving rise to this action occurred in the Eastern District of Louisiana, and the properties that are the subject of this action are situated within the Eastern District of Louisiana.

## WAIVER OF SOVEREIGN IMMUNITY

20.

The United States of America and, thus, the Corps waived their sovereign immunity in connection with the claims asserted in this suit by the enactment of the Federal Tort Claims Act, 28 U.S.C. § 2671 ("FTCA"). While Plaintiff believes that all of its claims against the Corps are derived from the FTCA applying the tort and other laws of the State of Louisiana, out of an abundance of caution, Plaintiff alternatively pleads admiralty and maritime jurisdiction and causes of action under the Admiralty Extension Act, 46 U.S.C. §30101 , the Suits in Admiralty Act, 46 U.S.C. § 30901-18, the Public Vessels Act, 46 U.S.C. § 31101-13, the Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq*, and the River & Harbors Act, 33 U.S.C.§403 *et seq*.

21.

Any immunity invoked by the Corps under 33 U.S.C. §702(c) is not available because the provisions of this Act do not apply, have not been complied with, and/or the liability of the Corps is not predicated on flood control activity. The activities undertaken by the Corps in connection with this litigation are not activities forming part of a federal flood control project, nor are the Corps's

activities in connection with an authorized federal control project. Accordingly, the provisions of the Flood Control Act of 1928, 33 U.S.C. §702(c), do not apply as a basis for governmental immunity. Furthermore, the United States Court of Appeals for the Fifth Circuit has already held that the Flood Control Act of 1928, 33 U.S.C. §§ 702(c), does not immunize the United States of America for its maritime activities related to the Mississippi River Gulf Outlet ("MR-GO"). *Graci v. United States*, 456 F.2d 20 (5th Cir. 1971).

## FACTUAL BACKGROUND REGARDING THE 17TH STREET CANAL

### A.    The History of the 17th Street Canal

22.

The canal known today as the "17th Street Canal" forms a significant portion of the boundary between Orleans Parish, Louisiana and Jefferson Parish, Louisiana. Historically, the 17th Street Canal has also been known as the "Metairie Outlet Canal," the "Metairie Outfall Canal," the "Metairie Relief Canal," and the "Upperline Canal."

23.

The 17th Street Canal originated at the start of the 1850's as a canal dug through swampy ground to provide a right-of-way. It was located where the Jefferson and Lake Pontchartrain Railway was built. The railway connected the town once called Carrollton with a shipping port on Lake Pontchartrain in the area today know as Bucktown. Figure 1 depicts the current location of the 17th Street Canal.

8

**Figure 1**



Figure 4.    Map showing detailed geometry and features of the New Orleans metropolitan area

24.

In 1858, a secondary canal was built, connecting the original canal to the river side of the

Metairie Ridge.  This spur canal was situated alongside a projected street numbered "17th Street,"

and, thus, the canal became known as the "17th Street Canal."  The term "17th Street Canal"

eventually referred to the original, larger canal to which this spur canal connected.

25.

The community of Bucktown, where the northern end of the 17th Street Canal enters Lake

Pontchartrain, was founded more than one hundred years ago as a group of fishing and hunting

camps along the canal and Lake Pontchartrain.  The earliest structures were wooden huts raised on

9

stilts, and the canal served as a harbor and a mode of transportation for fishing boats.

26.

More substantial development in this area occurred during the mid-19th century with the construction of a commercial wharf and a resort called "Lakeport." Steamboats docked at the entrance to the New Basin Canal (now Pontchartrain Boulevard) and at the terminus of the Jefferson and Lake Pontchartrain Railway (presently Bucktown).

27.

The SWB took over the operation of the 17th Street Canal at the end of the 19th century. The canal was re-dredged in 1897 and again in 1929. In 1913, the SWB completed the construction of Pumping Station No. 6, which drained a large portion of New Orleans through the canal. Until recent years, the 17th Street Canal was home to a fleet of approximately one hundred shrimp boats. The fleet previously had a lease agreement with the defendant SWB.

28.

The 17th Street Canal historically is, and at all times pertinent herein has been, a navigable waterway in New Orleans that flows into Lake Pontchartrain.

**B.    The 17th Street Canal Dredging Project**

29.

On July 15, 1974, the SWB initiated a project to improve drainage through the 17th Street Canal. Initially, this project called for the dredging of 2.4 miles of the canal from Pump Station No. 6 to Lake Pontchartrain to remove sediment from the canal bottom and to reshape the canal cross-section for the improvement of flow and the pump capacity of Pump Station No. 6. The removal of approximately 85,000 cubic yards of bottom sediment was anticipated.

10

30.

Because dredging projects in navigable waters of the United States require a Department of the Army permit pursuant to the River & Harbors Act, the SWB filed an application with the Corps for a "Permit to Discharge or Work in Navigable Waters and their Tributaries." The Operations Division of the Corps is responsible for the issuance of permits to dredge navigable waterways. Hence, the issuance of the dredging permit for the 17th Street Canal was the province of the Corps's Operating Division, and not, for example, the Corps's Engineering Division, which is responsible for flood control.

31.

The permit approval process required the SWB also to obtain approval from, among others, the Louisiana Department of Public Works. In August 1974, the Louisiana Department of Public Works responded to the 17th Street Canal dredge permit application by stating it could not complete a review of the application because the applicant (SWB) **had no soil data substantiating the stability or integrity of the canal's levees**.

32.

On May 23, 1977, the Corps returned the dredging application with no action because the SWB had failed to furnish information requested by, among others, the Louisiana Department of Public Works.

33.

In 1978, the SWB retained a civil engineering firm, Modjeski and Masters, Inc. ("M&M"), to provide a plan for the design and implementation of the dredging project. On August 23, 1979, M&M submitted a second dredging permit application on behalf of the SWB. On December 29,

11

1980, M&M re-submitted the dredging permit application after environmental concerns were raised relative to the disposal of the dredged material in Lake Pontchartrain and on the banks of the canal.

34.

On January 28, 1981, in response to inquiries about the impact of the dredging on existing levees, M&M provided the Corps a memorandum addressing the stability of the existing levees and sheet pile wall along the canal. M&M's memorandum indicated that at three of the six test locations, the factors of safety **fell below the required values set by the Corps.** The handwritten report specifically stated that **"two locations yielded low factors of safety due to ... the existence of very soft clays...."**

35.

On March 5, 1981, the Corps issued an internal memorandum addressing the soil stability analyses provided by M&M, which acknowledged that, in connection with the proposed dredging of the canal, safety factors were substantially below the minimum 1.30 factor of safety, requiring that the project be redesigned. The specific location of the canal's levee system to which this internal memorandum referred coincides with the area where the 17th Street Canal breached during Hurricane Katrina.

36.

On March 31, 1981, the Corps held a public hearing regarding the 17th Street Canal dredging permit application. Discussions took place regarding whether raising the existing sheet pile wall along the canal, as opposed to dredging to deepen the canal, would provide a greater cross-section and greater pump capacity. The consulting engineer representing M&M voiced his concerns about widening the canals and stated that **not only were the levees already in violation of the Corps's**

**engineering standards for levee stability but that dredging attempts to remove material adjacent to the levees would only worsen the stability problem.**

37.

On April 20, 1981, in response to concerns that the proposed dredging of the 17th Street Canal would negatively impact the existing canal levee, M&M announced a preliminary plan to install sheet pile walls with concrete caps prior to any dredging or excavation. The sheet pile walls were to be of a sufficient height to meet all applicable flood protection criteria. An internal Corps memorandum dated June 16, 1981, based on a review of this proposal by M&M, acknowledged that a number of levee and flood wall stability problems were likely to occur should the SWB dredging be granted.

38.

An internal memorandum from the Corps's Engineering Division to the Corps's Operations Division, dated February 12, 1982, noted the existence of a stability problem in the 17th Street Canal at a location where excavation would directly tap the sands underlying the levee. The memorandum suggested that a stability analysis be performed for the land side of the canal, incorporating effects of seepage to determine what corrective action might be needed. Sands underlay the entire 2.4 miles of the 17th Street Canal, from Pumping Station No. 6 to Lake Pontchartrain, and the stability problem recognized in this memorandum, therefore, cannot be confined to any one section of the canal.

39.

On August 23, 1982, Eustis Engineering Company ("Eustis") provided M&M with a more comprehensive subsoil investigation report, which in pertinent part recognized that measures "should be taken" because of "the possibility of a blow-out during extreme high water in the canal." The

13

report also identified "preventive measures," including "the installation of a seepage cutoff through the levee crown, installation of pressure relief wells near the land side toe of the levee, and sealing the canal bottom." Eustis's recommendations were restricted to only specific areas of the canal, however, and not to the entire canal levee system. On November 30, 1982, M&M furnished the Corps with copies of Eustis' soil investigation report.

40.

On February 22, 1983, the Chief of the Corps's Engineering Division advised the SWB that the Corps believed "the installation of relief wells would be an appropriate way to provide the necessary assurance against uplift" of the 17th Street Canal's sheet piles.

41.

On May 9, 1983, M&M submitted, on behalf of the SWB, a new permit application for the 17th Street Drainage Canal Improvement Project. This application was to supersede the application for Phase I, submitted on December 29, 1980, and Phase II, submitted on April 20, 1981, by combining the two phases into one project with the project limits being Pump Station No. 6 on the south and 370.0 feet north of the Bucktown Pedestrian Bridge. The project now envisioned the **removal of 470,000 cubic yards** of canal bottom whereas the original plan called for the removal of 85,000 cubic yards.

42.

On July 27, 1983, Eustis submitted a revised soil stability report, which both confirmed the potential for a blow-out at the land side toe of the levee and extended the area of concern to the pumping station. In this report, Eustis recommended dredging a test section in the 17th Street Canal to study the hydrostatic uplift pressure.

14

43.

From November 29 to December 16, 1983, a test section was dug just south of Interstate 10. Six piezometers were installed on the Jefferson Parish side of the 17th Street Canal to monitor closely changes in the hydrostatic pressures before, during, and after completion of the excavation. Eustis submitted a report on the test dredging to the Corps on January 17, 1984. The report concluded that the piezometers monitored no relevant changes upon the dredging of the test section. The report further concluded that the possibility of a blow-out during high-water conditions in the canal was probably slight. The piezometer study of the test section did not account, however, for the pre-existing, permeable soils of the canal, and, therefore, the study's conclusions as to stability and permeability were unreliable.

44.

On June 13, 1984, the Corps issued a permit to "dredge to enlarge and maintain an area and install and maintain flood walls and mooring structures, in the 17th Street Canal (Metairie Relief Canal) from Pumping Station No. 6 to a point about 400 feet north of the Bucktown Pedestrian Bridge..." The "Statement of Findings" issued with the permit stated that factors considered in issuing the permit included, *inter alia*, "navigation," both present and prospective flood heights and flood plain use, and "other public interests."

45.

The dredging project was ultimately divided into the following phases: Phase I from Pump Station No. 6 to Interstate 10; Phase II-A from Interstate 10 to Hammond Highway - Orleans side; Phase II-B from Interstate 10 to Hammond Highway - Jefferson side; and Phase III from Hammond Highway to Lake Pontchartrain.

46.

Phase I was completed June 1, 1984. Because the SWB and the OLD could not reach an agreement with EJLD regarding Phase II of the Project, however, an extension of the permit work was granted by the Corps on February 20, 1987.

47.

On April 24, 1987, the Corps created a drawing with a sheet pile design that indicated that the sheet pile tips were located 16 feet lower than the bottom of the 17th Street Canal. Even as the Operations Division of the Corps was addressing the SWB permit, therefore, its Engineering Division was addressing levee wall design that might incorporate the sheet piles that were permitted under the dredging project.

48.

On August 11, 1988, the SWB issued the work order for Phase III of the dredging project, and the job was completed on December 6, 1989. The work order for Phase II-A of the dredging project, which included the installation of the sheet piles on the Orleans Parish side of the canal, was issued on July 4, 1990, and the job was completed on January 10, 1992 by Boh Bros. Construction Co., Inc.

49.

The dredging activity conducted in the 17th Street Canal pursuant to the SWB permit was specified contractually to entail "bucket dredging" from a series of flex-float barges in the canal. The barges constituted vessels in navigation for the time period during which the dredging occurred.

16

### C.    The Construction of 17th Street Canal Concrete Monoliths

50.

Without any congressional authorization or re-authorization, the Corps unilaterally deviated from a congressionally authorized "Barrier Plan," which called for the installation of floodgates at the mouth of the 17th Street Canal (at Lake Pontchartrain).  Defendants SWB and OLD objected to the installation of these floodgates.  The Corps thereafter proposed a "Parallel Protection Plan" for the 17th Street Canal, which called for increasing the height of the flood barriers on the east and west banks of the canal.  This plan was part of an overall "High Level Plan," which replaced the "Barrier Plan" even though this change was not authorized by Congress.

51.

In connection with the "High Level Plan," the Corps considered three options — levees, T-walls, and I-walls.  The Corps rejected the use of levees and T-walls because such construction was purportedly not economically justified.  Instead, under the auspices of the Corps acting in connection with the OLD, the 17th Street Canal's flood walls were constructed with an "I-wall" design, which called for the construction of a concrete monolith on top of the existing sheet pile (in place from the dredging project).  Figure 2 depicts the differences in the design of the I-walls, T-walls, and levees.

**Figure 2**



Figure 3.    General schematic of major hurricane protection structures used in New Orleans and vicinity

52.

The U.S. Army Corps of Engineers Manual on Engineering, Design and Construction of

Levees, dated April 30, 2000, states that for stability reasons, flood walls utilizing the "I-wall" design

rarely exceed seven (7) feet above ground surface and that an inverted "T-wall" design is used when

walls higher than seven feet are required.  <u>**Nonetheless, the I-walls on the 17th Street Canal were**</u>

<u>**built in concrete sections that rise eleven (11) feet above the ground.**</u>

53.

Further, upon information and belief, Eustis performed a soil analysis in 1981, which entailed borings along the 17th Street Canal's levee. The borings revealed alternating layers of soft clay and black humus or peat — a soft, spongy soil comprised of decaying trees and other organic material — located fifteen to twenty-one feet below sea level. This layer of humus and peat substantially reduced the strength of the soil, particularly its strength in resisting lateral pressure and its ability to support the levee and flood walls under pressure from flood water.

54.

Despite Eustis's findings regarding the weak soil, however, the Corps elected to build the walls of the 17th Street Canal with steel sheet piling driven to a depth that was seventeen (17) feet below sea level — either above or in the middle of the layers of weak soil. To make matters worse, the soil adjacent to the 17th Street Canal levee subsided significantly after construction of the levee and flood wall, greatly reducing the amount of support that the land behind the levee provided against the pressure of flood waters.

55.

Then, in 1993, C.R. Pittman Construction Company, Inc. ("Pittman") was retained for the construction of the concrete monoliths atop the steel sheet pile wall along the 17th Street Canal. Pittman reported to the Corps that it was encountering major problems — specifically, the sheet pile walls and concrete monoliths were beginning to lean towards the canal side as the soil foundation was not of sufficient strength, rigidity and stability. Despite these concerns and problems, however, the Corps allowed the construction of the I-walls to continue, and Pittman built the concrete monoliths on top of the sheet pile driven into the unstable soil.

56.

Altogether, Defendants either failed to account for the soil and flood wall stability problems associated with the 17th Street Canal or proceeded with the engineering, design, and construction of the 17th Street Canal despite such problems. As a result of Defendants' combined negligence, the 17th Street Canal failed during Hurricane Katrina, flooding the surrounding area and causing extensive damage to Plaintiff's properties.

## FACTUAL BACKGROUND REGARDING THE LONDON AVENUE CANAL

57.

The London Avenue Canal was constructed in the first half of the 19th century through an area that was mostly swampland and later became part of the City of New Orleans. The canal originally served a dual purpose of commerce and drainage, *i.e.*, it both permitted small boat traffic from Lake Pontchartrain to a section of New Orleans and provided for swamp drainage. Figure 1 depicts the current location of the London Avenue Canal.

58.

The London Avenue Canal historically is, and at all times pertinent herein has been, a navigable waterway within the meaning of the general maritime law.

59.

The Corps, in coordination with the OLD and SWB, was responsible for the design and construction of the London Avenue Canal's levee system.

60.

A major project to upgrade the flood walls and bridges along the London Avenue Canal

began in the early 1980's. The Corps had previously proposed placing a floodgate at the hurricane levees where the London Avenue Canal entered Lake Pontchartrain to provide protection from storm surge. The OLD and SWB objected to this plan, however, and, instead, favored building and raising the height of the parallel flood walls and levee structures along each side of the canal (the aforementioned "Parallel Protection Plan"). By 1991, the Corps, OLD and SWB had decided to proceed with this latter plan.

61.

The resulting flood walls along the London Avenue Canal were constructed atop earthen levees with an "I-wall" design consisting of steel sheet pilings driven into the compacted dirt atop the levee with reinforcing steel rods threaded through the top of the piling. Concrete was poured to encapsulate the top of the pilings and form the wall. The wall is composed of individual concrete slab sections (monoliths) that are linked together by rubbery gaskets (water stops) intended to prevent water from flowing between the monoliths and to allow the concrete to expand and contract.

62.

**The entirety of the London Avenue Canal is constructed over beach sands of the Pine Island trend.** The sands are located approximately 13 to 15 feet below the crowns of the I-wall levees of the canal but are deeper in the vicinity where the northern breach occurred during Hurricane Katrina (station 113 to 118). The sand is covered with a veneer of peaty swamp deposits.

63.

Two key considerations in constructing an I-wall atop an earthen levee are 1) the composition of the soil into which the sheet piles will be driven and upon which the I-walls will rest and 2) the depth of the sheet piles based on the composition of the soil.

21

64.

Soil borings of the levee at the site of the London Avenue Canal south breach, which contributed to the catastrophe giving rise to this litigation, showed a layer of sand at a depth of 10 to 15 feet below sea level. Similar to the conditions at the south breach, soil borings of the levee at the site of London Avenue Canal north breach showed a layer of sand at a depth of 12 feet below sea level, as well as a layer of peat — a highly porous material that shrinks when dry and expands when wet, creating highly unstable soil conditions. Despite this layer of unstable sand, the sheet piles supporting the flood wall monoliths of the London Avenue Canal were driven to a depth of 14 feet below sea level. **Thus, the bottom of the sheet piles fell within a layer of sand**.

65.

As discussed *supra*, the flood walls along the London Avenue Canal are constructed with an "I-wall" design. The U.S. Army Corps of Engineers Manual on Engineering, Design and Construction of Levees dated April 30, 2000 states that, for stability reasons, flood walls utilizing the "I-wall" design rarely exceed seven (7) feet above ground surface and that an inverted "T-wall" design is used when walls higher than seven feet are required. **Nonetheless, the flood walls at the breach sites of the London Avenue Canal, although built with an "I-wall" design, have concrete sections that rise to eleven (11) feet above ground surface**.

66.

Altogether, Defendants either failed to account for the soil and flood wall stability problems associated with the London Avenue Canal or proceeded with the engineering, design, and construction of the London Avenue Canal despite such problems. As the result of Defendants' combined negligence, the London Avenue Canal failed during Hurricane Katrina, flooding the

surrounding area and causing extensive damage to Plaintiff's properties.

## FACTUAL BACKGROUND REGARDING THE ORLEANS AVENUE CANAL

67.

The Orleans Avenue Canal is a canal located in Orleans Parish and is connected on its north end to Lake Pontchartrain and on its south end with the SWB's Pumping Station No. 7. Figure 1 depicts the current location of the Orleans Avenue Canal.

68.

The levee and floodwall protection system along the Orleans Canal was incomplete at the time Hurricane Katrina struck the New Orleans area. Specifically, the embankment fronting the pump station, which is about four hundred feet long, is six feet lower than the floodwalls along the canal. That is, the floodwalls in this area are simply missing. As a result, the levee and floodwall protection system designed and constructed by Defendants was incomplete and did not provide adequate flood protection for the surrounding area, causing extensive water damage to Plaintiff's properties.

## FACTUAL BACKGROUND REGARDING HURRICANE KATRINA AND THE FAILURE OF THE 17TH STREET, LONDON AVENUE, AND ORLEANS AVENUE CANALS

69.

Hurricane Katrina made landfall at 6:10 a.m. near Buras, Louisiana, on the morning of Monday, August 29, 2005, with estimated maximum winds of 117 mph.

70.

On August 29, 2005, a major breach of the 17th Street Canal occurred on the Orleans Parish side of the canal between 9:00 a.m. and 9:15 a.m. The breach rapidly scoured to depths below mean

23

sea level, allowing lake and canal water to flow through the Orleans Parish bank of the canal well after the storm surge had subsided.

71.

The flooding as a result of the breach of the 17th Street Canal was totally catastrophic and caused extensive damage to Plaintiff's properties located at 1401 Foucher St., 3322 St. Claude, 3600 Prytania, 1407 Delachaise, 3527 Prytania Garage, 3437-39 Prytania, 3638 St. Charles, 3525 Prytania St., Ste. 105, 3450 Chestnut/Gumbel Building, 3434 Prytania/Buckman MOB, 1419 Amelia Street, 3515 Chestnut, and 3412 Prytania, New Orleans, Louisiana 70115.

72.

Upon information and belief, water began to enter the Gentilly area east of the London Avenue Canal between 7:00 and 8:00 a.m. on August 29, 2005, pouring through a 200-foot wide breach in the levee/flood wall on the east side of the London Avenue Canal, just north of the Mirabeau Avenue bridge. This breach is referred to as the "south breach" of the London Avenue Canal levee.

73.

The water from the south breach of the London Avenue Canal initially inundated the Gentilly area of New Orleans, an area bounded on the west by the London Avenue Canal, on the south by Gentilly Boulevard (the Metairie/Gentilly Ridge), on the east by the Inner Harbor Navigational Canal (the Industrial Canal) and on the north by Lake Pontchartrain. This water eventually combined with flood waters from other levee breaches, inundating other parts of New Orleans, including Plaintiff's properties located at 1401 Foucher St., 3322 St. Claude, 3600 Prytania, 1407 Delachaise, 3527 Prytania Garage, 3437-39 Prytania, 3638 St. Charles, 3525 Prytania St., Ste. 105, 3450

24

Chestnut/Gumbel Building, 3434 Prytania/Buckman MOB, 1419 Amelia Street, 3515 Chestnut, and 3412 Prytania, New Orleans, Louisiana 70115.

74.

Upon information and belief, water began to enter the Gentilly area west of the London Avenue Canal sometime before 9:00 a.m. on August 29, 2005, pouring through a 400-foot wide breach in the levee/flood wall on the west side of the London Avenue Canal, just south of the Robert E. Lee Bridge. This breach is referred to as the "north breach" of the London Avenue Canal levee.

75.

The water from the north breach of the London Avenue Canal initially inundated the Gentilly area of the city bounded on the west by Bayou St. John, on the north by Lake Pontchartrain, on the east by the London Avenue Canal, and along the southeastern side on a line drawn along Chef Menteur Highway to Gentilly Boulevard to Broad Street where it intersects with Orleans Avenue and then northwest along Orleans Avenue to Bayou St. John. This water eventually combined with flood waters from other levee breaches, inundating other parts of New Orleans, including Plaintiff's properties located at 1401 Foucher St., 3322 St. Claude, 3600 Prytania, 1407 Delachaise, 3527 Prytania Garage, 3437-Prytania, 3638 St. Charles, 3535 Prytania St., Ste. 105, 3450 Chestnut/Gumbel Building, 3434 Prytania/Buckman MOB, 1419 Amelia Street, 3515 Chestnut, and 3412 Prytania, New Orleans, Louisiana, 70115.

76.

Upon information and belief, at approximately 9:00 a.m. on August 29, 2005, as a result of Defendants' inadequate design and construction of the floodwalls along the Orleans Avenue Canal, the embankment fronting the pump station at the foot of the canal was overtopped and left

unprotected by missing floodwalls, causing significant water damage to the surrounding area.

77.

Notably, the storm surge associated with Hurricane Katrina did not overtop the flood walls at the sites of the 17th Street , London Avenue, and Orleans Avenue Canals.  Indeed, the hurricane did not exceed the designed parameters for these canals.  Thus, none of the flood wall breaches in question would have occurred as a result of Hurricane Katrina alone.  Rather, these breaches occurred solely as a result of Defendants' faulty and negligent engineering, design, construction, and maintenance of the 17th Street, London Avenue, and Orleans Avenue Canals.

## FACTUAL BACKGROUND REGARDING THE IPET REPORT

78.

The Corps has conceded that the failure of the New Orleans levee system, including the failures of the 17th Street , London Avenue, and Orleans Avenue Canals, was caused by the inadequate design, planning, and construction of the system's levees and floodwalls.  Following Hurricane Katrina, the Corps undertook a massive investigation of the reason for the levee and flood wall failures.  This investigation was coordinated by the Interagency Performance Evaluation Taskforce ("IPET").  On March 26, 2007, IPET issued its Interim Final and Final Reports concerning the Performance Evaluation of the New Orleans and Southeast Louisiana Hurricane Protection System ("IPET Report").

79.

IPET was created by the Chief of Engineers, U.S. Army Corps of Engineers to evaluate the New Orleans hurricane protection system in light of Hurricane Katrina.  IPET consisted of government, academic, and private sector scientists and engineers with extensive experience in the

26

field of civil engineering. The report was consistently peer reviewed before publication.

80.

The IPET Report provides extensive background regarding the construction of the hurricane protection system and reveals that, almost from the start, construction was based on inaccurate assumptions and calculations. IPET found that deficiencies existed throughout the levee system, which was constructed at an elevation below design specifications.

81.

Overall, IPET summed up its analysis of the hurricane protection system by acknowledging that its performance was compromised by the incompleteness of the system, the inconsistency in levels of protection, and the lack of redundancy. Volume I of the IPET Report made the following overall conclusions regarding the failure of the levees:

- Flood control structures in the region were authorized and designed relative to a water level datum (mean sea level), but constructed relative to a geodectic vertical datum *incorrectly assumed to be equivalent to the water level datum. This decision resulted, in the case of the outfall canals, in structures built approximately 1 to 2 ft below the intended elevation.*

- Sections of the system were built below specified design elevations due to the *use of an inaccurate relationship between the geodectic datum and mean sea level datum.*

- Coupled with the *use of average values* obtained from widely spaced samples in a geology with highly variable conditions, the structure was left *with a marginal factor of safety.*

- The structures were constructed on weak and compressible soils.

- The hurricane protection in New Orleans was designed and developed in a piecemeal fashion, resulting in inconsistent levels of protection.

- *Four breaches*, all in the outfall canals and all involving I-walls, *occurred before water levels reached the top of the floodwalls. All were caused by*

27

> *foundation failures* induced by the formation of a gap along the canal side
> of the floodwall. . . . *This failure mechanism*, in particular the gap
> formation, *was not considered in the original design of the structures.*

- The maintained condition of the levees was an additional negative factor in
  the performance of the system.

## FACTUAL BACKGROUND REGARDING THE MISSISSIPPI RIVER GULF OUTLET ("MR-GO") AND THE FUNNEL EFFECT OF THE MR-GO AND THE GULF INTRACOASTAL WATERWAY

82.

The Mississippi River Gulf Outlet ("MR-GO") was constructed in 1960 and exponentially

enhanced the surge risk and likelihood for Greater New Orleans. The MR-GO was built by the

Corps to provide shipping with a straight shot into the Gulf of Mexico, a 76-mile route that cuts 40

miles off the trip down the winding channel of the Mississippi River. In short, the MR-GO has

devastated the protective marsh structures immediately east of New Orleans, and by ruining these

adjacent marshes it has made its own levees that much more susceptible to erosion and failure.

Moreover, the construction of the MR-GO has created a "funnel effect" that increases the local storm

surge and poses a serious threat to public safety and an environmental threat to the region. Figure

1 depicts the current location of the MR-GO.

83.

The Gulf Intracoastal Waterway ("GIWW") forms a protected shipping lane between Port

Isabel, Texas (the Mexican border) and Apalachee Bay, Florida. The GIWW was a navigation canal

project completed between New Orleans and Corpus Christi, Texas by mid-1942. The GIWW was

officially completed in June 1949. In 1944, under the authority of the Corps, the GIWW was

rerouted to pass through the southern part of the IHNC, creating the first shallow channel through

28

the wetlands that would facilitate propagation of hurricane surge from Lake Borgne into the heart of New Orleans. The Corps had negligently created the first part of a "Hurricane Alley" right into the heart of New Orleans. Figure 1 depicts the current location of the GIWW.

**A.    Illegal Failure of the Corps to Coordinate with State of Louisiana**

84.

The Corps designed, constructed, operated and maintained the MR-GO according to faulty plans and specifications in violation of the River and Harbor Act of 1945, P.L. 79-14, 50 Stat. 10 (March 2, 1945) ("MR-GO Planning Law"), which reflected clear Congressional intent to involve the State of Louisiana (through its Governor or the governor's designee), as an "affected state," in investigation and planning. Congress also directed the Corps to "coordinate" its investigation and planning with the United States Department of Interior ("DOI"). The Corps failed to coordinate with and involve the Governor and the DOI and thus violated its duties and obligations established under the MR-GO Planning Law as well as the FWCA, *infra.*

**B.    Violation of Fish and Wildlife Coordination Act of 1934, as amended – Failure to Coordinate with Louisiana and Department of Interior and to do Required Study**

85.

The Fish and Wildlife Coordination Act ("FWCA"), 16 U.S.C. § 662, as amended in 1946 and 1958, also required coordination between any federal agency proposing to "impound," "divert," or "control" a waterway or body of water and the Fish and Wildlife Service. The MR-GO is such a waterway. The FWCA also required the Corps to consult with officials of the State of Louisiana and DOI during all phases of the MR-GO project, including investigation, planning and construction. The Corps was also directed therein to incorporate any of the observations or concerns raised by

29

these state and federal agencies into any plans and specifications for the design and construction of the MR-GO. The Corps failed in its duties under said laws. In fact, a 1958 DOI report concluded that detailed investigations, coordinating hydrological, vegetative, fish and wildlife findings, as well as a model study, would be a prerequisite to predictions of the MR-GO's effects and establishment of mitigatory measures. The report concluded further that "this project should be thoroughly investigated from the biological standpoint before construction through the marshes below Paris Road and the Sound is undertaken." A four year regime of testing and study to assess the impact of the MR-GO was recommended. The Corps negligently, recklessly, wantonly, and illegally proceeded to build the MR-GO without waiting for the completion of the essential four-year study requested by the DOI. The Corps knew or should have known that construction of the MR-GO through the wetlands from the GIWW to the Gulf would devastate Louisiana and its wetlands and result in the negligent, reckless, wanton or illegal destruction by the Corps of the best "speed-brake" and inhibitor to tidal surges.

### C.    Failure of the Corps to Follow MR-GO 1951 Authorization Report

86.

On September 25, 1951, the Corps submitted a report to Congress with its recommendations for construction of the MR-GO ("MR-GO Authorization Report"). This report contained a letter from the former Corps Chief of Engineers stating that the proposed MR-GO would be connected to the Industrial Canal by its own *separate* canal running parallel to the GIWW. Nonetheless, such a separate parallel canal was not built, and, instead, the Corps unilaterally deviated from the MR-GO Authorization Report by not digging a separate parallel canal to the IHNC/Industrial Canal. Rather, the Corps connected the MR-GO into the existing GIWW and significantly deepened and widened

30

the GIWW from the point of connection to the IHNC/Industrial Canal, thus increasing vessel traffic

and producing significantly increased hydrological consequences that were a proximate cause of the

flooding of Greater New Orleans.

**D.    Failure of Corps to Conduct Studies Recommended by its Own Board of Engineers**

87.

The MR-GO Authorization Report also included a report from the Corps's Board of

Engineers recommending further studies into the MR-GO's impact on the Louisiana coast and

opined: "[t]he exact location of the outlet to the Gulf and the alignment of the seaway should be

determined after more complete studies of sand movement, wave action, and local currents are made

in cooperation with the Beach Erosion Board. Hence, if the improvement is authorized, ample

provision should be made for modifications of the location and alignment of the canal should further

studies show that a more suitable location is available." No such studies were done, and, thus, the

Corps did not consider alternatives that would have been less destructive to the lands and wetlands

of Louisiana; such negligence, reckless, wanton or illegal acts or omissions were a proximate cause

of the damages sustained by Plaintiff.

**E.    Other Regulatory Violations by the Corps**

88.

The Corps failed further to follow requirements of 33 CFR §§ 335-38, particularly 33 CFR

§ 336.1(c)(4) and 33 CFR § 320.4(b) and Executive Order 11990. The Corps deviated from and/or

failed to execute its dredging activities (maintenance and operation of the MR-GO) in the manner

required by the Corps pursuant to 33 CFR §§ 337.5 and 338.2. Furthermore, the Corps failed to

follow requirements of the State of Louisiana (made applicable by 33 CFR § 337.2), including those

31

contained in Chapter 7, Sections 701 and 707 of the Louisiana Administrative Code relating to dredging activities. In its actions and omissions set forth above, the Corps also violated several federal and state statutes implicated in the design, construction, maintenance and operation of the MR-GO, including the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 (c); the Water Resources Development Act of 1990 (WRDA), 33 U.S.C. §§ 2316 and 2317; the Coastal Zone Management Act, 16 U.S.C. § 1452, *et seq.* and the Louisiana State and Local Coastal Resources Management Act, La. R.S. 49:214.21 *et seq.* Additionally, the Corps and its contractors (with the actual knowledge or under the direction of the Corps) illegally and improperly transported or otherwise disposed of dredge spoil, including, but not limited to, negligent and illegal placement of said spoil as spoil banks.

### F.  Illegal and/or Negligent Failure of the Corps to Follow Authorized Design, Route and Alignment

89.

After hearings, Congress authorized the construction of the MR-GO in 1956 (P.L.-455). The Corps unlawfully failed to follow the congressionally authorized design, route or alignment. The Corps also did not conduct required studies, consultation and coordination to mitigate adverse environmental impact to Louisiana in the destruction of highly productive estuarine water and marsh areas; nor did the Corps reduce or eliminate what would prove to be disastrous hydrological consequences to Greater New Orleans.

### G.  Failure of the Corps to Heed Multiple Warnings of Impending Disaster

90.

After the hurricanes of 1947 and 1965 (Betsy), the Corps knew or should have known of the

hazards posed by the MR-GO and the effects of its negligent design, construction, operation and maintenance. Additionally, the Corps knew or should have known of the high probability of future damages likely to result from the inundation of Greater New Orleans. In recognition of the probability of further future damage to Greater New Orleans from the MR-GO project, the Corps illegally and/or negligently (or through gross negligence, wanton and/or reckless acts and/or omissions) failed to close the MR-GO, constructed control structures, and/or constructed levees, floodwalls, and other structures in a defective, negligent, sub-standard fashion; such "Levee" allegations are detailed separately herein.

91.

Virtually from inception of the planning and construction, the Corps received many warnings of impending disaster that would befall Greater New Orleans as a result of the negligent design, construction, operation and maintenance of the MR-GO and of the failure of the Corps to do timely what it should have done to eliminate or at least ameliorate the impending inundation of Greater New Orleans. Those warnings put the Corps repeatedly on notice of massive destruction to marshes, wetlands and other land and forest areas – all resulting from the negligent and/or faulty inspection, design, construction, operation and maintenance of the MR-GO.

**H.    Effect of the MR-GO on the GIWW During Hurricane Katrina**

92.

During Hurricane Katrina, as the storm surge increased in intensity, an accelerated/enhanced hurricane surge was propelled up the MR-GO, rushing water within the MR-GO into the GIWW and causing certain levees and floodwalls of the GIWW to collapse, fail or become overtopped. This failure of the GIWW's protection system was primarily due to the Corps's construction of the

33

GIWW with porous, erodible lightweight "shell sand" fill or other inappropriate fill material not suitable for levee construction, especially without sheetpile cutoff, concrete, armoring or similar features to prevent erosion, undercutting, collapse or failure.

93.

As a proximate result of the negligent, grossly negligent, reckless, wanton and/or illegal acts or omissions of the Corps described herein, Plaintiff sustained damages.

### FACTUAL BACKGROUND REGARDING THE WEST BREACH OF THE INNER HARBOR NAVIGATIONAL CANAL ("INDUSTRIAL CANAL")

94.

Dredging of the Inner Harbor Navigation Canal ("Industrial Canal") began on June 6, 1918. Excavation work commenced with the construction of parallel dikes on either side of the canal. The more resistant clay materials that were excavated were dragged up onto the dikes and were gradually built up to become permanent protective levees. Figure 1 depicts the current location of the Industrial Canal.

95.

From the onset, contractors battled problems with slope stability when constructing the Industrial Canal, as the soft oozy soils constantly slid back into the excavation. Essentially, the levees and floodwalls along the Industrial Canal were built on a layer of organic marsh and peat with very soft clays. Fifteen feet below the top of the embankment is a layer of soft clay with silt and sand, which are very weak materials. The Corps was aware of these problems.

96.

The deficiencies in the construction of the Industrial Canal led to breaches on the west side of the canal during Hurricane Katrina where a three hundred-foot section of an I-wall failed at a railroad yard, and a seventy-foot section of levee comprised of a sandy "shell" fill was scoured and blew out, causing extensive damage to Plaintiff's properties.

97.

The City of New Orleans is the sole owner of the New Orleans Public Railroad Commission, a non-profit switching railroad that operates switches and terminal services for over 100 miles of track in New Orleans.

98.

On or about September 11, 2004, a New Orleans Public Railroad Train derailment caused a thirty-two and a half foot wide gap in Floodgate W-30, which is part of the floodwall system situated immediately west of the Industrial Canal.

99.

On December 14, 2004, PBR paid OLD $427,387.96, the full estimated cost of the reconstruction of Floodgate W-3. On information and belief, both PBR and OLD failed to assure these repairs were made before the August 2005 catastrophe giving rise to this action, resulting in extensive damage to Plaintiff's properties.

100.

Further, upon information and belief, CSX Corps. and/or CSX Inc. (collectively "CSX") designed and constructed a railroad crossing at or near the Industrial Canal's flood protection structures. In doing so, CSX utilized highly erodible, lightweight, and/or porous materials,

including, but not limited to, "shell sand" and gravel, which caused CSX's structure to be significantly weaker than the surrounding flood protection structures. Upon information and belief, CSX also failed to install a "sheet pile cutoff" or similar device to prevent or limit erosion of its structure. Indeed, CSX could have prevented the failure of its structure at a minimal cost by installing concrete "sheet pads" or other erosion protection devices at the base of the I-walls of the Industrial Canal.

101.

PNO has the full and exclusive right, jurisdiction, power and authority to govern the Port of New Orleans and is responsible for the maintenance of it wharves, terminals, marshaling yards, cranes, and all transportation and infrastructure affecting the regulation of commerce. The Industrial Canal is connected to the Port of New Orleans and is within the jurisdiction and control of PNO.

102.

Upon information and belief, PNO never tested whether the design, construction, and/or maintenance of the structures of the Industrial Canal were adequate, proper, and compliant with the requisite standards. PNO's failure to ensure the adequacy of the design, composition, construction, and maintenance of the Industrial Canal's levees and floodwalls contributed to the breach of the Industrial Canal on the west side, which caused extensive damage to Plaintiff's properties.

## FACTUAL BACKGROUND REGARDING THE "LAKE PONTCHARTRAIN, LOUISIANA AND VICINITY, HURRICANE PROTECTION PROJECT"

103.

The majority of the levee and/or I-wall structures surrounding the New Orleans metropolitan area were constructed, in part, under the authority of the "Lake Pontchartrain, Louisiana and

Vicinity, Hurricane Protection Project" ("Lake Pontchartrain Project"). Congress first authorized the implementation of the Lake Pontchartrain Project in the Flood Control Act of 1965 to provide hurricane protection to the areas surrounding Lake Pontchartrain. The Corps was primarily responsible for the project's design and construction.

104.

The Corps based its design and construction of the Lake Pontchartrain Project on the 1959 Standard Project Hurricane, which the Corps knew to be obsolete by 1972 when the construction of the Lake Pontchartrain Project actually began. As a result, the Corps designed and constructed the levees and floodwalls associated with the Lake Pontchartrain Project based on outdated specifications, leaving the hurricane protection system deficient and subjecting the New Orleans area to an increased threat of flooding.

105.

Additionally, as discussed *supra*, the Corps rejected the congressionally authorized Barrier Plan that called for a series of levees and other flood control structures, including barriers and flood control gates, to prevent storm surges from entering Lake Pontchartrain in the event of a hurricane. The Barrier Plan was purposefully selected by Congress over another alternative, the High-Level Plan, which would have excluded the barriers and flood control gates called for by the Barrier Plan and replaced them with higher levees and flood protection structures along the lakefront and other areas. Congress rejected the High-Level Plan because it was seriously flawed in many respects, including, but not limited to, prolonged construction time, displacement of residences, less efficient floodwalls, a hampered interior drainage system, less protection to the Northshore, and increased cost.

37

106.

Despite Congress's approval of the Barrier Plan and rejection of the High-Level Plan, Defendants elected to implement the High-Level Plan without obtaining the required authorization from Congress and knowing of the High-Level Plan's deficiencies.

107.

By the mid 1980's, as more residences were built along the canals, the Corps proposed to provide greater protection from storm surge by implementing a parallel protection plan that called for raising the height of the existing levees and sheet pile floodwalls along each side of the canals. As discussed *supra*, Defendants implemented this parallel protection plan, electing to use I-walls rather than T-walls which would have provided a higher level of stability and reliability, especially in soft soil conditions.

108.

On or about August 29, 2005, the I-walls designed and constructed by Defendants along the 17th Street Canal, London Avenue Canal, Orleans Avenue Canal, Industrial Canal, and the GIWW failed catastrophically due to Defendants' unauthorized, negligent, wanton and/or reckless, and unilateral decision to abandon the congressionally authorized Barrier Plan and implement the flawed parallel protection plan utilizing the I-wall design.

## DAMAGES SUSTAINED BY PLAINTIFF

109.

Plaintiff avers that, to date, it has sustained total damages in the amount of $43,740,000.00, as a direct and proximate result of the negligence and/or fault of the Defendants herein. Plaintiff

further avers that it continues to sustain damages as a direct and proximate result of the negligence and/or fault of the Defendants herein.

## COUNT I:

## NEGLIGENCE OF DEFENDANTS
## IN THE DREDGING OF THE 17TH STREET CANAL

110.

Plaintiff repeats and re-alleges the allegations in all preceding paragraphs as though fully set forth herein.

111.

The Corps, OLD, EJLD, and SWB had the legal responsibility and duty to Plaintiff to cause, allow, and/or conduct the dredging of the 17th Street Canal in a manner that would not compromise the safety of the canal's levee/flood wall system. As discussed *supra*, the Corps, OLD, EJLD, and SWB ignored federal regulations and engineering standards and entirely disregarded overwhelming evidence that the dredging of the 17th Street Canal would dangerously compromise the canal's flood protection levee.

112.

As a result of the negligence of the Corps, OLD, EJLD, and SWB the dredging of the 17th Street Canal worsened the stability of the canal's levee and flood walls and eventually contributed to the failure of the canal during Hurricane Katrina, causing extensive damage to Plaintiff. Defendants St. Paul and National Union, as the insurers of OLD and EJLD, are directly liable to Plaintiff for its damages.

39

113.

As a direct and proximate result of the negligence of the Corps, OLD, EJLD, and SWB in the dredging of the 17th Street Canal, Plaintiff suffered extensive damage, including, but not limited to, loss of property (both immovable and movable), diminution of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees, and other special damages to be proven at trial.

## COUNT II:

## NEGLIGENCE OF DEFENDANTS IN THE DESIGN, CONSTRUCTION AND MAINTENANCE OF THE 17TH STREET CANAL LEVEES AND FLOOD WALLS

114.

Plaintiff repeats and re-alleges the allegations in all preceding paragraphs as though fully set forth herein.

115.

The Corps, OLD, EJLD, and SWB had a legal responsibility and duty to Plaintiff to cause, allow, and/or conduct the design and construction of the levees and flood walls of the 17th Street Canal in a manner that would not compromise the safety of the canal's levee/flood wall system. As discussed *supra*, the Corps, OLD, EJLD, and SWB knew or should have known of the deficiencies in the design and construction of the 17th Street Canal, particularly given the nature of the soil in the area and the height and instability of the I-walls.

116.

The Corps, OLD, EJLD, and SWB negligently abandoned a congressionally authorized plan to install floodgates at the 17th Street Canal, which would have lessened the storm surge from

40

Hurricane Katrina, opting instead to use a "parallel" plan pursuant to which the 17th Street Canal levee and flood wall system was inadequately designed and built.

117.

The Corps, OLD, EJLD, and SWB negligently ignored multiple reports regarding the weak and unstable sand and soil below the 17th Street Canal and negligently designed and constructed the 17th Street Canal with I-walls built at 11 feet above ground, despite engineering guidelines discouraging the use of I-walls at heights greater than 7 feet above ground.

118.

The Corps, OLD, EJLD, and SWB negligently failed to maintain and inspect properly the 17th Street Canal levee/flood wall system, which would have led to the correction or exposure of its deficiencies such that the failure of the system could have been prevented.

119.

As a result of the negligence of the Corps, OLD, EJLD, and SWB, the design and construction of the 17th Street Canal worsened the stability of the canal's levee and flood walls and eventually contributed to the failure of the canal during Hurricane Katrina, causing extensive damage to Plaintiff. Defendants St. Paul and National Union, as the insurers of OLD and EJLD, are directly liable to Plaintiff for its damages.

120.

As a direct and proximate result of the negligence of the Corps, OLD, EJLD, and SWB in the design, construction, and maintenance of the 17th Street Canal, Plaintiff suffered extensive damage, including, but not limited to, loss of property (both immovable and movable), diminution

41

of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees, and other special damages to be proven at trial.

## COUNT III:

## NEGLIGENCE OF DEFENDANTS IN THE DESIGN, CONSTRUCTION, AND MAINTENANCE OF THE LONDON AVENUE CANAL LEVEES AND FLOODWALLS

### 121.

Plaintiff repeats and re-alleges the allegations in all preceding paragraphs as though fully set forth herein.

### 122.

The Corps, OLD, EJLD, and SWB had a legal responsibility and duty to Plaintiff to cause, allow, and/or conduct the design and construction of the levees and flood walls of the London Avenue Canal in a manner that would not compromise the safety of the canal's levee/flood wall system. As discussed *supra*, the Corps, OLD, EJLD, and SWB knew or should have known of the deficiencies in the design and construction of the London Avenue Canal, particularly given the nature of the sand and soil in the area and the height and instability of the I-walls.

### 123.

The Corps, OLD, EJLD, and SWB negligently abandoned a congressionally authorized plan to install floodgates at the London Avenue Canal, which would have lessened the storm surge form Hurricane Katrina, opting instead to use a "parallel" plan pursuant to which the London Avenue Canal levee and flood wall system was inadequately designed and built.

124.

The Corps, OLD, EJLD, and SWB negligently ignored multiple reports regarding the weak and unstable sand and soil below the London Avenue Canal and negligently designed and constructed the London Avenue Canal with I-walls built at 11 feet above ground, despite engineering guidelines discouraging the use of I-walls at heights greater than 7 feet above ground.

125.

The Corps, OLD, EJLD, and SWB negligently failed to maintain and inspect properly the London Avenue Canal levee/flood wall system which would have led to the correction of or exposure of its deficiencies such that the failure of the system could have been prevented.

126.

As a result of the negligence of the Corps, OLD, EJLD, and SWB, the design and construction of the London Avenue Canal worsened the stability of the canal's levee and flood walls and eventually contributed to the failure of the canal during Hurricane Katrina, causing extensive damage to Plaintiff. Defendants St. Paul and National Union, as the insurers of OLD and EJLD, are directly liable to Plaintiff for its damages.

127.

As a direct and proximate result of the negligence of the Corps, OLD, EJLD, and SWB in the design, construction, and maintenance of the London Avenue Canal , Plaintiff suffered extensive damage, including, but not limited to, loss of property (both immovable and movable), diminution of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees, and other special damages to be proven at trial.

## COUNT IV:

## NEGLIGENCE OF DEFENDANTS IN THE DESIGN, CONSTRUCTION, AND MAINTENANCE OF THE ORLEANS AVENUE CANAL LEVEES AND FLOODWALLS

128.

Plaintiff repeats and re-alleges the allegations in all preceding paragraphs as though fully set forth herein.

129.

The Corps, OLD, EJLD, and SWB had a legal responsibility and duty to Plaintiff to cause, allow, and/or conduct the design and construction of the levees and flood walls of the Orleans Avenue Canal in a manner that would not compromise the safety of the canal's levee/flood wall system. As discussed *supra*, the Corps, OLD, EJLD, and SWB knew or should have known of the deficiencies in the design and construction of the Orleans Avenue Canal, particularly given the embankment fronting the pump station at the foot of the canal that was left unprotected by missing floodwalls.

130.

As a result of the negligence of the Corps, OLD, EJLD, and SWB, the design and construction of the Orleans Avenue Canal failed to provide adequate flood protection to the surrounding area, causing extensive damage to Plaintiff's property. Defendants St. Paul and National Union, as the insurers of OLD and EJLD, are directly liable to Plaintiff for its damages.

131.

As a direct and proximate result of the negligence of the Corps, OLD, EJLD, and SWB in the design, construction, and maintenance of the Orleans Avenue Canal, Plaintiff suffered extensive

damage, including, but not limited to, loss of property (both immovable and movable), diminution of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees, and other special damages to be proven at trial.

## COUNT V:

## NEGLIGENCE OF THE CORPS IN THE DESIGN, CONSTRUCTION AND MAINTENANCE OF THE MR-GO

132.

Plaintiff repeats and re-alleges the allegations in all preceding paragraphs as though fully set forth herein.

133.

The Corps had a legal responsibility and duty to Plaintiff to cause, allow, and/or conduct the design and construction of the MR-GO in a manner that would not compromise the safety of the New Orleans area. As discussed *supra*, the Corps knew or should have known of the deficiencies in the design and construction of the MR-GO.

134.

The Corps's negligence and/or fault in designing, engineering, inspecting and/or constructing the MR-GO, included, *inter alia*, without limitation (1) failing to take account of the waterway's inherent and known capability of serving as a funnel or conduit for rapidly accelerated, storm-driven surges which would magnify the storm surge's force against levees, flood walls, and spoil banks in New Orleans; and (2) failing to account for the devastation (through the construction itself as well as subsequent salt water intrusion and accelerated erosion) of the wetlands, forests and land masses,

thus, denuding and destroying a critical natural buffer against storm surge, and thereby further exacerbating the funnel effect created by the MR-GO's design.

135.

As a result of the negligence of the Corps, the MR-GO created a deadly funnel effect during Hurricane Katrina, exacerbating the storm surge and causing extensive damage to Plaintiff's properties.

136.

As a direct and proximate result of the negligence of the Corps in the design, construction, and maintenance of the MR-GO, Plaintiff suffered extensive damage, including, but not limited to, loss of property (both immovable and movable), diminution of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees, and other special damages to be proven at trial.

## COUNT VI:

### NEGLIGENCE IN THE DESIGN, CONSTRUCTION, AND MAINTENANCE OF THE GULF INTRACOASTAL WATERWAY

137.

Plaintiff repeats and re-alleges the allegations in all preceding paragraphs as though fully set forth herein.

138.

The Corps had a legal responsibility and duty to Plaintiff to cause, allow, and/or conduct the design and construction of the GIWW in a manner that would not compromise the safety of the New Orleans area. As set forth herein, the Corps was negligent in the design, construction, and

46

maintenance of the Hurricane Protection System around the GIWW in the following, non-exclusive, particulars: construction of the levees and floodwalls with porous, erodible lightweight "shell sand" fill, or other inappropriate fill material not suitable for levee construction, especially without sheetpile cutoff, concrete armoring or similar features to prevent erosion, undercutting, collapse or failure, or due to negligently inadequate height.

139.

As a result of the negligence of the Corps, the deficiencies in the levees and floodwalls of the GIWW were exacerbated by the "funnel effect" created through the ship channels of the MR-GO, causing extensive damage to Plaintiff's properties.

140.

As a direct and proximate result of the negligence of the Corps in the design, construction, and maintenance of the GIWW, Plaintiff suffered extensive damage, including, but not limited to, loss of property (both immovable and movable), diminution of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees,  and other special damages to be proven at trial.

## COUNT VII:

## NEGLIGENCE OF DEFENDANTS IN THE DESIGN, CONSTRUCTION, AND MAINTENANCE OF THE INDUSTRIAL CANAL

141.

Plaintiff repeats and re-alleges the allegations in all preceding paragraphs as though fully set forth herein.

142.

47

The Corps, PNO, CSX, and PBR had a legal responsibility and duty to Plaintiff to cause, allow, and/or conduct the design and construction of the levees and flood walls of the Industrial Canal in a manner that would not compromise the safety of the canal's levee/flood wall system. As discussed *supra*, the Corps, PNO, CSX, and PBR knew or should have known of the deficiencies in the design, construction, and maintenance of the Industrial Canal.

143.

As a result of the negligence of the Corps, PNO, CSX, and PBR in the design, construction, and maintenance of the Industrial Canal, the Industrial Canal breached on the west side, causing damage to Plaintiff's properties.

144.

As a direct and proximate result of the negligence of the Corps, PNO, CSX, and PBR in the design, construction, and maintenance of the Industrial Canal, Plaintiff suffered extensive damage, including, but not limited to, loss of property (both immovable and movable), diminution of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees, and other special damages to be proven at trial.

## COUNT VIII:

### DEFENDANTS' NEGLIGENCE IN IMPLEMENTING THE "LAKE PONTCHARTRAIN, LOUISIANA AND VICINITY, HURRICANE PROTECTION PROJECT"

145.

Plaintiff repeats and re-alleges the allegations in all preceding paragraphs as though fully set forth herein.

48

146.

The Corps, OLD, EJLD, SWB, St. Paul, and National Union had a legal responsibility and duty to Plaintiff to cause, allow, and/or conduct the implementation of the Lake Pontchartrain Project in a manner that would not compromise the safety of the hurricane protection system. As discussed *supra*, the Corps, OLD, EJLD, SWB, St. Paul, and National Union knew or should have known of the deficiencies in the implementation of the Lake Pontchartrain Project as Defendants purposefully rejected the congressionally authorized Barrier Plan and instead implemented a parallel protection plan utilizing a flawed I-wall design.

147.

As a result of the negligence of the Corps, OLD, EJLD, SWB, St. Paul, and National Union, the 17th Street Canal, London Avenue Canal, Orleans Avenue Canal, Industrial Canal, and the GIWW failed catastrophically, causing Plaintiff to suffer extensive damage, including, but not limited to, loss of property (both immovable and movable), diminution of property value, business interruption damages, attorneys' fees, and other special damages to be proven at trial.

## COUNT IX:

## STRICT LIABILITY

148.

Plaintiff repeats and re-alleges the allegations in all preceding paragraphs as though fully set forth herein.

149.

The Corps, OLD, EJLD, SWB, St. Paul, and National Union had, at all relevant times, the care, custody and control, and thus the *garde* of the 17th Street, London Avenue, and Orleans Canals

and the levees/floodwalls adjacent thereto. As such those Defendants strictly liable to Plaintiff for its damages resulting from the vices and/or defects within these canals and their levees/floodwalls, in accordance with Louisiana Civil Code article 2317, *et seq*.

150.

The Corps and PNO had, at all relevant times, the care, custody and control, and thus the *garde* of the Industrial Canal and the levees/floodwalls adjacent thereto. As such those Defendants are strictly liable to Plaintiff for its damages resulting from the vices and/or defects within the Industrial Canal and its levees/floodwalls, in accordance with Louisiana Civil Code article 2317, *et seq*.

151.

The Corps had, at all relevant times, the care, custody and control, and thus the *garde* of the MR-GO and the GIWW and the levees/floodwalls adjacent thereto. As such the Corps is strictly liable to Plaintiff for its damages resulting from the vices and/or defects within the MR-GO and the GIWW and theirlevees/floodwalls, in accordance with Louisiana Civil Code article 2317, *et seq*.

152.

Plaintiff expressly pleads the doctrine of *Res Ipsa Loquitur* against each and all of the Defendants, as may be appropriate under the circumstances and permitted by law.

## COUNT X:

## NUISANCE

153.

Plaintiff repeats and re-alleges the allegations in all preceding paragraphs as though fully set forth herein.

154.

As the proprietor of the 17th Street, London Avenue, and Orleans Avenue Canals, the Corps,

OLD, EJLD, SWB, St. Paul, and National Union  had a duty, pursuant to Louisiana Civil Code

article 667, to refrain from creating a nuisance with respect to these canals.  As the proprietor of the

Industrial Canal, the Corps and PNO had a duty, pursuant to Louisiana Civil Code article 667, to

refrain from creating a nuisance with respect to this canal. As the proprietor of the MR-GO and the

GIWW, the Corps had a duty, pursuant to Louisiana Civil Code article 667, to refrain from creating

a nuisance with respect to these canals. Because of Defendants' negligence, however, Plaintiff has

been deprived from the use and enjoyment of its properties.  Thus, Defendants have created a

nuisance by ignoring the hazardous conditions in the hurricane protection system.

155.

Defendants have violated the federal common law doctrine of nuisance. The negligent and/or

reckless actions of Defendants in creating and ignoring the hazardous conditions in the hurricane

protection system have caused unique and significant harm to Plaintiff as discussed *supra* and have

deprived Plaintiff from the use and enjoyment of its properties.  Thus, Defendants are liable for

Plaintiff's damages, including, but not limited to, loss of properties (both immovable and movable),

diminution of property value, loss of income, costs of relocation, loss of business opportunities,

evacuation expenses, attorneys' fees,  and other special damages to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that:

(1)      The Corps, OLD, EJLD, SWB, St. Paul, and National Union be held liable for all of

Plaintiff's damages  caused by their negligence in the dredging of the 17th Street Canal, including,

but not limited to, Plaintiff's loss of property (both immovable and movable), diminution of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees, and other special damages to be proven at trial;

(2)     The Corps, OLD, EJLD, SWB, St. Paul, and National Union be held liable for all of Plaintiff's damages caused by their negligence in the design, construction, and maintenance of the 17th Street Canal, including, but not limited to, Plaintiff's loss of property (both immovable and movable), diminution of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees, and other special damages to be proven at trial;

(3)     The Corps, OLD, EJLD, SWB, St. Paul, and National Union be held liable for all of Plaintiff's damages caused by their negligence in the design, construction, and maintenance of the London Avenue Canal, including, but not limited to, Plaintiff's loss of property (both immovable and movable), diminution of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees, and other special damages to be proven at trial;

(4)     The Corps, OLD, EJLD, SWB, St. Paul, and National Union be held liable for all of Plaintiff's damages caused by Defendants' negligence in the design, construction, and maintenance of the Orleans Avenue Canal, including, but not limited to, Plaintiff's loss of property (both immovable and movable), diminution of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees, and other special damages to be proven at trial;

(5)     The Corps be held liable for all of Plaintiff's damages caused by its negligence in the

52

design, construction, and maintenance of the MR-GO, including, but not limited to, Plaintiff's loss of property (both immovable and movable), diminution of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees, and other special damages to be proven at trial;

      (6)     The Corps be held liable for all of Plaintiff's damages caused by its negligence in the design, construction, and maintenance of the GIWW, including, but not limited to, Plaintiff's loss of property (both immovable and movable), diminution of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees, and other special damages to be proven at trial;

      (7)     The Corps, CSX, PBR and PNO be held liable for all of Plaintiff's damages caused by their negligence in the design, construction, and maintenance of the Industrial Canal, including, but not limited to, Plaintiff's loss of property (both immovable and movable), diminution of property value, business interruption damages, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, attorneys' fees, and other special damages to be proven at trial;

      (8)     The Corps, OLD, EJLD, SWB, St. Paul, and National Union be held liable for all of Plaintiff's damages caused by Defendants' negligence in the implementation of the Lake Pontchartrain Project, including, but not limited to, Plaintiff's loss of property (both immovable and movable), diminution of property value, loss of income, costs of relocation, loss of business opportunities, evacuation expenses, business interruption damages, attorneys' fees, and other special damages to be proven at trial;

      (9)     Defendants be held strictly liable for Plaintiff's damages resulting from the vices and/or defects within all canals and their levees/floodwalls, in accordance with Louisiana Civil Code

53

article 2317, *et seq.*, and the doctrine of *Res Ipsa Loquitur*;

(10)     Defendants be held liable for Plaintiff's damages resulting from Defendants' creation

of a nuisance in creating and ignoring the hazardous conditions of the hurricane protection system;

(11)     Defendants be held liable for all of Plaintiff's attorneys' fees and costs associated

with this litigation pursuant to the Federal Tort Claims Act and/or the Equal Access to Judgments

Act;

(12)     Defendants be held liable for all pre-judgment and post-judgment interest on all

amounts awarded to Plaintiff; and

(13)     Any other equitable and general relief in the nature of this case will allow.

Respectfully submitted,


JAMES M. GARNER , #19589, T.A.
DARNELL BLUDWORTH, #18801
**SHER GARNER CAHILL RICHTER
KLEIN & HILBERT, L.L.C.**
909 Poydras Street, 27th Floor
New Orleans, Louisiana 70112
Telephone: (504) 299-2100
Facsimile:  (504) 299-2300
**ATTORNEYS FOR PLAINTIFF
TOURO INFIRMARY**